case came up in an agreed statement of facts. The landlord claimed a lien under the statute laws of Kentucky, which give the landlord a lien on the property of the tenant or sub-tenant on the leased premises for twelve months' rent, due or to become due. The assignee claimed that he had a right under the bankrupt act to surrender the lease, and that neither the assignee nor the bankrupt's estate were liable to pay the sum of four hundred and fifty-two dollars and fifty cents, claimed by the landlord.

BALLARD, District Judge. I am induced to the opinion that under the bankrupt act the landlord's right to rent against the bankrupt's estate expires on the day of the adjudication. If the assignee occupy the premises after that day, he, and not the estate, is liable for the rent. But, of course, when his occupancy is for the benefit of the estate, and is in fact beneficial, he will be credited by the rent which he is obliged to pay. In this case the rent should be paid to January thirteenth, eighteen hundred and seventy-two, and no longer.

=======

## Case No. 17,316.

### In re WEBB.

[Decided by the supreme court of New York, Second District, October 22, 1862. See 10 Pittsb. Leg. J. 106.]

=======

## Case No. 17,317.

### In re WEBB.

[4 Sawy. 326; 16 N. B. R. 258; 10 Chi. Leg. News, 27; 5 N. Y. Wkly. Dig. 174.] [1]

District Court, D. Nevada. Sept. 7, 1877.

BANKRUPTCY OF A PARTNER — JOINT CREDITOR — PROOF OF DEBT.

A joint creditor, in case of the separate bankruptcy of one member of the firm, has a right to prove his joint debt, and vote for assignee in the separate bankruptcy.

[In the matter of Watson T. Webb, a bankrupt.] Webb, at the time he was adjudged a bankrupt, was a member of the firm of Webb & Mallard. At the first meeting of his creditors the register permitted both joint creditors of Webb & Mallard and separate creditors of Webb to prove their debts and vote for assignee. But two votes were cast for assignee, one by a joint creditor for James Hood, and one by a separate creditor for A. H. Ricketts. The register declared a failure to elect, and, there being no opposition, appointed James Hood to be assignee. Exception was taken to the action of the register in allowing the joint creditor to prove and vote, and the point has been certified for decision. There is also an application on behalf of Ricketts for an order removing Hood and appointing him as assignee. The register certifies that the only assets surrendered are joint assets.

---

[1] [Reported by L. S. B. Sawyer, Esq., and here reprinted by permission. 5 N. Y. Wkly. Dig. 174, contains only a partial report.]

Whitman & Wood, for petitioner.
James Hood, in person, opposed.

HILLYER, District Judge. Whether a joint creditor may prove his joint debt and vote for assignee, in case of the separate bankruptcy of one member of the firm, is the question to be decided. Under our present bankrupt law [14 Stat. 517], many important consequences result from the proof of a debt, or the having a provable debt. By section 5034 the choice of assignee is to be made by the "greater part in value and in number of the creditors who have proved their debts." If it can be shown, then, that the joint creditors have a right to prove their debts, it would seem to follow that they have a right to vote for assignee. While there are conflicting decisions as to the effect of such proof, so far as my search has gone, all agree that the joint creditors may prove their debts in the separate bankruptcy, under section 5067. That section allows "all debts due and payable from the bankrupt" to be "proved against the estate of the bankrupt." Section 6 of the bankrupt act of 1800 (2 Stat. 23) allowed the "creditors" of the bankrupt to prove their debts, and under this general designation of "creditors" it was the opinion of the supreme court that a joint creditor might prove his debt in a separate bankruptcy. Tucker v. Oxley, 5 Cranch [9 U. S.] 34. Speaking of the joint debt in that case, Marshall, C. J., says: "Although due from the company, yet it is also due from each member of the company." It was also held that a proviso, similar to our present section 5118, that "the discharge should not affect any person liable as partner with the bankrupt," while the act did provide for a discharge from all debts which were, or might have been, proved, removed all doubt as to the right of a joint creditor to prove against the estate of one partner in bankruptcy.

I should be content to rest my decision upon the language of the present bankrupt law and the authority of Tucker v. Oxley, but for the fact that the decisions under the existing law are not uniform.

It was held, directly, that the joint creditors could not vote for assignee in case of the separate bankruptcy of one partner. In re Purvis [Case No. 11,476]. Yet in that case the joint creditors had proved their debts, apparently without objection. In Wilkins v. Davis [Id. 17,664], Lowell, J., states the true rule to be that the joint creditors may prove and vote for assignee.

In the following cases the right of the partnership creditors to prove their debts in the separate bankruptcy is conceded: In re Frear [Case No. 5,074]; In re Pease [Id. 10,881]; U. S. v. Lewis [Id. 15,595]. But no question as to their right to vote for assignee arose.

There are a number of other cases which indirectly touch this question. They are those upon the effect of a discharge granted to one partner in his separate bankruptcy. The law is (section 5119) that "a discharge in bankruptcy, duly granted, shall * * * release the

bankrupt from all debts, claims, liabilities and demands which were or might have been proved against his estate in bankruptcy." Whether or not a creditor's claim is released by a discharge depends upon its provableness; whether or not he can vote for assignee depends upon his having proved his debt.

Under our present bankrupt law there are decisions that a discharge granted to one partner, in his separate bankruptcy, releases him from his joint as well as individual debts. Such are In re Downing [Case No. 4,044]; In re Stevens [Id. 13,393]; In re Abbe [Id. 4]; In re Leland [Id. 8,228]; Wilkins v. Davis [supra]. There are also cases holding that such a discharge does not so release him. Such are Hudgins v. Lane [Case No. 6,827]; In re Winkens [Id. 17,875]. And see In re Noonan [Id. 10,292]; In re Little [Id. 8,390]; In re Grady [Id. 5,654].

These latter cases indirectly decide that the joint debts are not provable, as the former, it seems to me, decide that they are provable in the separate bankruptcy.

Again, it has been held that a joint debt is a provable debt under section 5021, and will support a petition for a separate adjudication against one partner. In re Melick [Case No. 9,399]. This has long been the rule in England. Ex parte Crisp, 1 Atk. 133; Ex parte Elton, 3 Ves. 238. And there, notwithstanding the general rule is to the contrary, the joint creditor, who takes out a separate commission, shares in the separate estate pari passu with the separate creditors. Story, Partn. § 278.

It may, then, be safely assumed that in this country the general current of authority is in favor of the provableness of the joint debts in the separate bankruptcy. It follows, from the language of the bankrupt act, that if the joint creditors may prove they may vote for assignee. Beyond this it is not necessary to decide the effect of proving the joint debts in the present case. The action of the register in allowing the joint creditors of Webb & Mallard to prove their debts and vote for assignee is approved, and the prayer of the petition is denied.

---

## Case No. 17,318.

### WEBB v. ANDERSON.

[Taney, 504.][1]

Circuit Court, D. Maryland. April Term, 1858.

CHARTER PARTY—LIEN FOR FREIGHT—ASSIGNMENT OF BILLS OF LADING TO SECURE ADVANCES—DELIVERY OF CARGO—WAIVER OF LIEN—BANKRUPTCY.

1. The vessel, of which the libellant was master, was chartered to take a cargo of flour from City Point, in Virginia, to Rio Janeiro, and taking in a cargo of coffee at Rio, to proceed to Baltimore; the charterer was to pay $1.25 per barrel on the flour, in full for the hire of the vessel for the round voyage: so much thereof as might be needed for expenses, was to be paid to the master at Rio, and the balance, on the

1 [Reported by James Mason Campbell, Esq., and here reprinted by permission.]

arrival of the vessel at Baltimore. The charterer obtained from L. G. (the claimant) large advances upon the flour, and endorsed the bills of lading (which were "to order") to L. G., who endorsed them to his agent at Rio, with directions to purchase coffee with the proceeds, to be shipped to him at Baltimore: the agents of L. G., at Rio, took possession of the flour, on its arrival, and shipped, by the same vessel, to Baltimore, one hundred and thirty bags of coffee, consigned to L. G.: on the arrival of the vessel at Baltimore, the charterer having meanwhile stopped payment, the coffee consigned to the claimant, was taken possession of, under these proceedings, to meet the owner's claim for the freight due by the charterer: the net proceeds of the sale of the flour at Rio did not cover the whole amount of the claimant's advances on it, and the consignment of coffee was insufficient to make up the deficit. *Held*, that if the coffee be regarded as the property of the charterer, and shipped by his agents, and the claim of L. G. nothing more than a lien upon it, it would be liable to the whole amount of the freight due under the charter-party.

2. As between charterer and ship-owner, it is always implied, unless there be an express contract to the contrary, that the freight must be paid before the delivery of the cargo.

3. If the interest which the claimant acquired in the flour was a mere lien which attached itself to the proceeds, and to the coffee purchased with the proceeds, then the lien for freight would be prior, and preferred to his.

4. But the interest of L. G. (the claimant) in the coffee, was something more than a mere lien; it was his property, and the charterer had no right to the possession or control of it, nor to the proceeds, unless a surplus remained, after satisfying the amount to secure which the flour had been transferred to the claimant.

5. The lien of the ship-owners upon the return cargo, under this charter-party, did not depend upon the funds with which it was purchased.

6. The claimant was a mortgagee of the flour, and nothing more; but to the extent of his interest, his rights stand on the same ground as if he had been the purchaser; and to that extent he is to be considered the purchaser and owner of the flour, from the time of the assignment and delivery to him of the bills of lading.

7. The claimant, however, purchased subject to existing claims, and whatever rights the ship-owners had, at that time, acquired under the charter-party, either to the outward or inward cargo, remained unchanged.

8. The delivery of the flour to the agents of the claimant at Rio, was a delivery to the claimant, who therefore held it, by reason of such delivery to him, discharged of any lien for freight, and consequently, when the flour was sold, there could be no lien upon the proceeds.

9. Under these circumstances, the coffee was purchased with the claimant's money, and shipped as his property at the ordinary freight.

10. If the bill of lading signed by the master was in violation of his duty, or inconsistent with the charter-party, it would not impair the rights of the ship-owners.

11. But this charter-party does not contain the usual clause by which the owner binds the ship, and the charterer binds the cargo to the performance of all the covenants in the charter-party, and upon general principles of law, the merchandise is bound for its own transportation only, and its liability cannot be extended further, except by stipulations in the charter-party under which the voyage was performed.

In admiralty. The libel in this case was filed by the late Judge Glenn, on the 20th of